**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

SAVE THE GARDEN, *et al.*,

    *Plaintiffs*,

v.

CITY OF CLEARWATER,

    *Defendant*.

_____/

Case No. 8:26-cv-1662-KKM-AEP

**Preliminary Injunctive
Relief Requested**

### PLAINTIFFS' TIME-SENSITIVE MOTION
### FOR PRELIMINARY INJUNCTION

Plaintiffs in this case attempted to exercise their right of initiative under the Clearwater City Charter, filing their initiative with the City Clerk, circulating petitions, and submitting over 8,000 signatures for verification so that their proposal could go before the voters at the August 2026 primary election. But the City Clerk failed to fulfill her duties under the Charter. She enforced against them a Charter requirement that violates the First Amendment, unlawfully rejected valid petitions, and failed to give Plaintiffs the required notice as to why she rejected petitions.

As a result of these illegal actions, the City determined that Plaintiffs' initiative effort had *not* attained the required number of signatures. As demonstrated below, Plaintiffs are entitled to a preliminary injunction so these violations can be remedied swiftly ahead of the upcoming elections.

Plaintiffs respectfully request that the Court expedite its consideration of this motion to ensure that a necessary interim remedy is timely adopted and Plaintiffs have the opportunity to place their initiative on the ballot in the next feasible election. A

request for an evidentiary hearing and oral argument is attached to this motion. Plaintiffs also suggest that it would be appropriate to consolidate the trial on the merits with the preliminary injunction hearing under Rule 65(a)(2), given the circumstances of this case and issues involved.

## MEMORANDUM

### I.    Clearwater Charter Provisions Governing Initiatives

Section 6.01 of the Clearwater City Charter grants the People the right to initiate ordinances, providing in relevant part that "[t]he voters of the city shall have power to propose ordinances to the council, and, if the council fails to adopt an ordinance so proposed without any change in substance, to adopt or reject it at a city election . . . ." Section 6.04 lays out how an initiative effort starts:

> Any five voters may commence initiative . . . proceedings by filing with the city clerk . . . an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses, specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered.[1]

After the petitioners' committee affidavit is filed, the Clerk then issues blank petition forms, and petition circulation begins. Charter § 6.04. Section 6.05(a)–(c) lays out the requirements for initiative petitions themselves:

- Section 6.05(a) provides the number required: "ten percent of the total

---

[1] Here and in other Charter quotations, references to "referendum" and "recall"—other forms of direct democracy the Charter provides for—are omitted.

number of voters registered to vote in the last regular city election."

- Section 6.05(b) lays out the petition format, including that "[p]etitions shall contain or have attached thereto throughout their circulation the full text of the ordinance proposed . . . ."

- Section 6.05(c) requires each petition paper to have attached to it, when filed, an affidavit executed by the circulator.

Section 6.06 lays out the City Clerk's duties once the petitions are submitted:

> Within 20 days after the initiative . . . petition is filed, the city clerk . . . shall complete a certificate as to its sufficiency, specifying, if it is insufficient, the particulars wherein it is insufficient and shall promptly send a copy of the certificate to the petitioner's committee by registered mail. Grounds for insufficiency are only those specified in section 6.05 hereof.

If the Clerk finds the petition insufficient, the sponsors have the right to supplement their petition with additional signatures within 10 days of receiving the Clerk's certificate of insufficiency:

> A petition certified insufficient for lack of the required number of valid signatures may be amended once if the petitioners' committee files a notice of intention to amend with the city clerk . . . within two working days after receiving the copy of the city clerk's certificate and files a supplementary petition within ten days after receiving the copy of such certificate. The supplementary petition shall comply with the requirements of subsections (b) and (c) of section 6.05 hereof and within five days after it is filed the city clerk . . . shall complete a certificate as to the sufficiency of the petition as amended and promptly send a copy of such certificate to the petitioner's committee by registered mail as in the case of an original petition.

If the amended petition is still deemed insufficient, the petitioner's committee

has the right to request a review by the City Council. Charter § 6.06(b). If deemed sufficient, the initiative must be submitted to the voters at an election between 90 and 150 days from the date the petition is deemed sufficient. Charter § 6.08(b).

## II.    The Save the Garden Initiative

On June 15, 2025, Plaintiffs Brooks Gibbs, Jill Gibbs, Andujar, Myer, and Tello began the Save the Garden initiative (titled "Voter Approval Required for the Vacation of Public Right-of-Way in the Downtown") by submitting the required affidavit. **Ex. 1** (initiative and affidavit); **Ex. 2** (Myer Decl.) ¶ 3. The Clerk then "issue[d] the appropriate petition blanks" under Charter Section 6.04. **Ex. 3** (petition blank); Myer Decl. ¶ 4. Over the next months, Save the Garden and its supporters collected thousands of signatures from Clearwater voters. Myer Decl. ¶ 5.

Several months into petition collection, on October 7, 2025, the Clerk informed Ms. Myer that one of the five petitioners' committee members, Ms. Andujar, was not a registered Clearwater voter. *Id.* ¶ 6. The same day, Save the Garden added two additional Clearwater voters—Plaintiffs Mathis and Basler—to the petitioners' committee by filing affidavits with the Clerk. *Id.* ¶ 7. By the next day, Ms. Andujar submitted a voter registration application, and she was added to the voter rolls on October 8. *Id.* ¶ 8; **Ex. 4** (Andujar Decl.) ¶ 7.

Starting before the petition was filed, Plaintiffs sought clarity from the City Clerk on whether volunteers who were *not* members of the petitioners' committee could circulate petitions. The Clerk told Plaintiffs that the City's Legal Department was researching the matter, and she would advise of their findings. **Ex. 5** (June 12,

4

2025 Clerk Email). Having not received an update, on October 22, 2025, Mr. Gibbs again asked if the petitioners' committee could delegate to volunteer circulators. **Ex. 6** (10/16–23/25 Clerk-Gibbs Emails) at 3. After saying she checked with the Legal Department, the Clerk responded to the question: "the city charter is clear – the petitioner's committee is responsible for circulating the petitions." *Id.* at 2. Mr. Gibbs sought clarity: "When you note that the petitioner's committee is 'responsible' for circulating the petitions, can you clarify your definition of 'circulating'?" *Id.* at 1. But this time, the Clerk said she couldn't provide legal advice. *Id.*

The Clerk's suggestion that only petitioners' committee members could circulate petitions—*i.e.*, that other supporters could not circulate petitions and collect signatures—severely limited the pace of petitioning. Myer Decl. ¶ 12–13. Relying on the Clerk and trying to proceed as cautiously as possible, the committee members circulated petitions by themselves (or ensured volunteers collected signatures only in a committee member's presence). *Id.* ¶ 12. With just seven individuals circulating petitions, Save the Garden could only gather a limited number of signatures. *Id.* ¶ 13. Faced with an impossible task—collecting 7,067 signatures with just seven circulators—Save the Garden eventually decided in early December 2025 to rely on additional supporters to circulate petitions. *Id.* ¶ 14. In the end, despite the City's (at best) unwillingness to clarify how it would apply the rule, or (at worst) incorrectly suggesting that only committee members could circulate petitions, the Clerk did not reject signatures on the grounds that they were collected by non-committee members.

On March 17, 2026, Save the Garden submitted 8,051 signatures to the Clerk.

5

*Id.* ¶ 15; **Ex. 7** (Initial Certificate) ¶ 11. On April 2, the Clerk issued a certificate finding the petition insufficient because it failed to attain the required signatures and did not have the full text attached to each petition form. Myer Decl. ¶ 16; Initial Certificate. Exercising their right to amend the petition under Charter Section 6.06(a), Save the Garden filed a supplementary petition with 701 additional petition signatures on April 17. Myer Decl. ¶ 19; **Ex. 8** (Amended Certificate) ¶ 17. On April 22, the Clerk issued an amended certificate still finding the petition insufficient for the same reasons. Myer Decl. ¶ 20; Amended Certificate. On May 21, the City Council approved the Clerk's finding. Myer Decl. ¶ 22.

The next day, Plaintiffs filed this action in state court. Dkt. No. 1-1. Plaintiffs moved to expedite the case on June 1; a hearing on that motion was set for June 5. Dkt. No. 1-3 at 11--15. The City removed to this Court on June 4. Dkt. No. 1.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). Plaintiffs bear the burden of persuasion on each factor, and each is required for preliminary relief. *Id.*

At the preliminary-injunction stage, courts "may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the

6

evidence is appropriate given the character and objectives of the injunctive proceeding." *Wynn v. Vilsack*, 545 F.Supp.3d 1271, 1276 (M.D. Fla. 2021) (quoting *Levi Strauss & Co. v. Sunrise Int'l Trading Inc.*, 51 F.3d 982, 985 (11th Cir. 1995)).

## ARGUMENT

### I.    Plaintiffs are substantially likely to prevail on their free speech claims.

"[T]he circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech.'" *Meyer v. Grant*, 486 U.S. 414, 421–22 (1988). When the government imposes limits on petition circulation, therefore, it "bears the burden of justifying [these] restrictions on political expression by advancing at least 'a sufficiently important interest' that is 'closely drawn to avoid unnecessary abridgment of associational freedoms.'" *ACLU of Fla., Inc. v. Lee*, 546 F.Supp.3d 1096, 1102 (N.D. Fla. 2021) (quoting *Let's Help Fla. v. McCrary*, 621 F.2d 195, 199 (5th Cir. 1980), *aff'd*, 454 U.S. 1130 (1982) (mem.)).

The Clerk rejected as invalid 4,306 signatures because they "were collected prior to the Petitioner's Committee being comprised of five voters on October 7, 2025," citing the Charter's requirement that the committee to be comprised of "voters," who are "responsible for circulating the petition." Initial Certificate ¶ 13; Charter § 6.04. The Supreme Court rejected a near-identical requirement that petition circulators be registered voters in *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182 (1999). The Court noted that "[t]he requirement that circulators be not merely voter eligible, but registered voters . . . decreases the pool of potential circulators" and "'limit[s] the number of voices who will convey the initiative proponents' message'

and, consequently, cut[s] down 'the size of the audience proponents can reach.'" *Buckley*, 525 U.S. at 194–95 (quoting *Meyer,* 486 U.S. at 422–23) (alterations in original omitted). Colorado could not justify such a restriction on core political speech. *Id.* at 645. Nor can the City justify its near-identical restriction. The City's enforcement of this rule violates Plaintiffs' First Amendment rights under *Buckley*. *See* Myer Decl. ¶¶ 9–10; Andujar Decl. ¶¶ 3–4.

## II.    Plaintiffs are substantially likely to prevail on their City Charter claims.

Apart from the substantial First Amendment issues, Plaintiffs challenge the City's rejection of petitions on multiple grounds as illegal under the City Charter. "In interpreting [a] statute, [Florida courts] follow the 'supremacy-of-text principle'— namely, the principle that 'the words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" *Ham v. Portfolio Recovery Assocs., LLC,* 308 So. 3d 942, 945 (Fla. 2020) (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 56 (2012)) (alterations in original omitted)). "We also adhere to the view [that] 'every word employed in [a legal text] is to be expounded in its plain, obvious, and common sense . . . .'" *Advisory Op. to Gov'r re Implementation of Amend. 4,* 288 So. 3d 1070, 1078 (Fla. 2020) (quoting Joseph Story, *Commentaries on the Constitution of the United States* 157-58 (1833)). These principles govern interpretation of city charters too. *Martinez v. Hernandez*, 227 So. 3d 1257, 1259 (Fla. 3rd DCA 2017); *Congregation 3401 Prairie Bais Yeshaya D'Kerestir, Inc. v. City of Miami Beach,* 672 F. Supp. 3d 1286, 1293 (S.D. Fla. 2023). With these principles in mind, Plaintiffs discuss each of the reasons why the petition rejections were illegal.

**Inactive voters:** First, the Clerk verified the petition using only the *active* voter roll, erroneously rejecting all signatures from *inactive* voters. Myer Decl. ¶ 23–25. In Florida, a voter is designated "inactive" after they fail to respond to an "address confirmation final notice" within 30 days, or if the notice is returned as undeliverable. Fla. Stat. § 98.065(4)(d). An inactive voter remains registered and eligible to vote.[2] An inactive voter is only removed from the rolls if they do not update their registration information, request a mail ballot, or vote by the second general election after being placed on the inactive list. Fla. Stat. § 98.065(4)(d). Voters who are not on the "inactive" list are on the "active" list of voters. Clearwater has over 15,000 registered voters designated as inactive.[3] The Clerk simply ignored all of the inactive voters when verifying signatures and rejected signatures of inactive voters. Myer Decl. ¶ 23; **Ex. 9** (Gibbs Decl.) ¶ 4.

But the Charter makes no distinction between active and inactive voters. Section 6.01 provides that "[t]he *voters* of the city shall of the power to propose ordinances." (emphasis added). Under Section 6.05(a), petitions "must be signed by *voters* of the city equal in number to" the required threshold (emphasis added). The plain text provides that *all voters*—not just active ones—may sign a petition. "[C]ourts may not insert words or phrases in ordinances to express intentions which do not appear," yet that is

---

[2] Fla. Division of Elections, *Voter Registration – New and Removed*, https://dos.fl.gov/ elections/data-statistics/voter-registration-statistics/voter-registration-reports/voter-registration-new-and-removed/ (updated May 11, 2026).

[3] Pinellas Cnty. Supervisor of Elections, *April Totals by City and City/Wards* (May 15, 2026), https://www.votepinellas.gov/Archive.aspx?ADID=250#docaccess-3a4426662186d4c4c33 db75767863797 (listing 15,901 inactive voters in Clearwater).

exactly what the City proposes by inserting "active" before "voters" in the Charter. *Smith*, 75 So. 3d at 802 (quoting *Powell v. City of Delray Beach*, 711 So. 2d 1307, 1309 (Fla. 4th DCA 1998)). This it cannot do. Rather, the "plain and obvious meaning" of "voters" is *all* voters. The City's rejection of inactive voters was therefore illegal.

**Signatures collected before Oct. 7, 2025:** As discussed above, the City's rejection of 4,306 signatures collected before the petitioners' committee was comprised of five voters violates the First Amendment. But additionally, the Charter does not authorize the Clerk to declare a petition insufficient due to the petitioners' committee makeup or the registration status of its members. Section 6.06 is explicit: "Grounds for insufficiency are only those specified in section 6.05 hereof." Section 6.05, in turn, provides only four grounds for insufficiency: number of signatures, form and content, circulator's affidavit, and the time frame. Rules about the petitioners' committee's makeup are not among these grounds. The Clerk's rejection of petitions because they were collected before the committee was comprised of five voters was therefore illegal. *See Mayfield v. Sec'y, Fla. Dep't of State,* 402 So. 3d 1002, 1006–07 (Fla. 2025) (explaining that an official tasked with a particular responsibility by law cannot exercise independent discretion or look to criteria not expressly stated in the relevant statute).

**Petitions circulated with full text:** The Clerk found the petition insufficient because "[t]he petitions submitted [] did not contain the full text of the proposed ordinance or have attached hereto the proposed ordinance." Initial Certificate ¶ 16. But the Charter does not require petitions to contain the full text or have it attached upon submission, *after* circulation; it requires petitions to do so "*throughout* their

circulation." Charter § 6.05(b) (emphasis added). Each petition circulator swore under oath that each petition form they circulated *did* have attached to it the full text throughout its circulation, and the forms did, in fact, have the full text attached. Myer Decl. ¶ 30. Indeed, many of the forms still bear the staple-holes from where the full text was stapled during circulation and then removed for convenience before submission to the Clerk. *Id.* ¶ 32. The Clerk's rejection of the petition for this reason was therefore illegal and erroneous as well.

**Rejection of other valid signature:** The Clerk rejected a number of valid signatures for other unlawful reasons:

- The voter's name was entered incorrectly by City staff when they searched the voter roll, and then rejected despite the voter being registered. For example, Paul Panilio was entered with "Paul" as his last name and rejected; Renee Dubuque was entered as "Dubugue" and rejected; William Brown was entered as "M. Brown" and rejected. Gibbs Decl. ¶ 7.

- The voter had a nonstandard name (like Spanish double last names) and was rejected. For example, Beatriz Dezengotita was searched as "De Zengotita" and rejected; a voter registered as Jessica Perez Marcelino (double last name) signed as Jessica Perez, and was rejected. *Id.*

- The voter's address numbers were entered incorrectly by City staff when they searched the voter roll. For example, one voter had 2s in his address entered as 7s, and was rejected for having a different address than the one on his voter record. *Id.* ¶ 8.

- The voter listed a City of Clearwater address that did not match the address on their voter record (i.e., a voter who had moved and had not yet updated their voting address). *Id.* ¶ 5.

- The voter listed their street address on their voter record but omitted an apartment number. *Id.* ¶ 10.

- A voter wrote down their address but had a minor mistake or discrepancy

11

in their house number. *Id.* ¶ 6. For example, 93-year-old Lorene Berkes registered at "1920 Carlos Ave" but wrote "192" and was rejected as not registered to vote. *Id.* ¶ 11.

- The voter was rejected for another completely erroneous reason. For example, voters were rejected for having registered to vote after signing, even when they were registered for years before signing. *Id.* ¶ 9. Another voter was rejected for having a different address, but her address on the petition is the same as on the voter roll. *Id.*

Charter Section 6.05(b) requires only that the voter write their address on the petition. An address mismatch, omitted apartment number, or minor mistake in a house number is not a valid reason for rejection. And certainly, a signature cannot be rejected because the Clerk misread the voter's handwriting or searched the voter's name incorrectly—or for no apparent reason at all.

**Insufficient certificate:** Charter Section 6.06(a) requires the Clerk to "complete a certificate as to [the petition's] sufficiency, specifying, if it is insufficient, the particulars wherein it is insufficient[.]" The Clerk's certificate did not specify those particulars. It did not specify that she rejected signatures because voters were designated as inactive, or how many she rejected for that reason; did not specify that she rejected signatures because of a mismatched address; and did not specify that she rejected signatures because of an omitted apartment number, minor mistake in a house number, misread handwriting, or because she searched for names incorrectly. *See generally* Initial Certificate. Plaintiffs only learned of the specifics (i.e., the "particulars) of why signatures were rejected after submitting public records requests and obtaining and reviewing the responses after waiting to receive the records. Myer Decl. ¶¶ 17–18, 25–28.

It is critical that the certificate give organizers enough information to evaluate the reasons why a signature was rejected, so they have adequate notice of how many additional signatures they need to collect, or what they need to do to cure invalid signatures. *Id.* ¶¶ 17–18. The Clerk's failure to provide the particulars for why signatures were invalid stymied Plaintiffs' efforts to cure those purported failures and delayed their ability to challenge the improper rejections. *See id.* Because the Clerk's certificate failed to specify the particulars wherein the petition was insufficient, the certificate was contrary to the Charter and unlawful.

III. **Plaintiffs will suffer irreparable harm absent an injunction, and the balance of equities tips in their favor.**

Absent an injunction, Plaintiffs will suffer irreparable harm for which there is no adequate remedy at law—they will be unable to exercise their right of initiative and lose the opportunity to place their initiative on the ballot at the upcoming election. Those injuries cannot be undone by monetary remedies. *See Scott v. Roberts*, 612 F.3d 1279, 1295 (11th Cir. 2010) ("An injury is irreparable if it cannot be undone through monetary remedies." (quotation omitted)). Additionally, "[t]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Fla. Preborn Rescue, Inc. v. City of Clearwater*, 161 F.4th 732, 747 (11th Cir. 2025) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

The irreparable harm Plaintiffs face outweighs any burden an injunction might create for the City, and an injunction is in the public interest. Indeed, the public's rights are implicated by the City's actions—their right to sign onto the initiative and have

13

their signatures count, and their right to vote on the initiative in a timely manner should it reach the threshold. "[C]autious protection of the Plaintiffs' franchise-related rights is without question in the public interest." *Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). The public "has no interest in enforcing an unconstitutional law." *Scott*, 612 F.3d at 1297; *see also Fla. Preborn*, 161 F.4th at 748 (quoting *KH Outdoor, LLC v. City of Trussville*, 458 F.3d 1261, 1272 (11th Cir. 2006)).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court issue a preliminary injunction enjoining the City from enforcing its unconstitutional and illegal petition practices, namely by ordering the City to accept as valid (1) inactive voters' signatures, (2) the signatures of voters collected before the petitioners' committee was comprised of five voters, (3) petition forms submitted without the full text of the proposed ordinance when submitted, but which bear a completed circulator's affidavit, (4) signatures with a mismatched address, missing apartment number, minor mistake in an address, or handwriting that City staff misread; and (5) signatures the City rejected because its staff entered voters' information incorrectly when matching them to the voter roll.

Plaintiffs further request that the Court order the City to (1) issue a corrected certificate as to the petition's sufficiency, (2) permit Plaintiffs to file a supplementary petition thereafter pursuant to Charter Section 6.06(a), and (3) if the petition is

14

sufficient, submit the proposed ordinance to the voters by the deadline provided in

Charter Section 6.08 as if the Clerk had issued a valid certificate initially.[4]

Respectfully submitted June 5, 2026,

*/s/ Nicholas L.V. Warren*
Nicholas L.V. Warren (FBN 1019018)
Daniel B. Tilley (FBN 102882)
**ACLU Foundation of Florida**
4343 West Flagler Street, Suite 400
Miami, FL 33134
(786) 363-1769
nwarren@aclufl.org
dtilley@aclufl.org

Anthony F. Sabatini (FBN 1018163)
**Sabatini Law Firm P.A.**
1601 East 1st Avenue
Mount Dora, FL 32757
(352) 455-2928
anthony@sabatinilegal.com

*Counsel for Plaintiffs*

---

[4] Plaintiffs request that the Court require a bond of no more than $50. *See Scott v. City of Daytona Beach*, 689 F. Supp. 3d 1160, 1170 (M.D. Fla. 2023) ("[T]he amount of security required by the rule is a matter within the discretion of the trial court, and the court may elect to require no security at all." (alterations in original omitted) (quoting *BellSouth Telecomms., Inc. v. MCImetro Access Transmission Servs.*, 425 F.3d 964, 971 (11th Cir. 2005))).