**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

SAVE THE GARDEN, *et al.*,

    *Plaintiffs*,

v.                                                                                  Case No. 8:26-cv-1662

CITY OF CLEARWATER,

    *Defendant*.

_____/

## <u>DECLARATION OF KELLY MYER</u>

I, Kelly Myer, am over the age of 18 and make this declaration based upon my personal knowledge as follows:

### A. Save the Garden Formation and Petition Circulation

1. I am one of the founding petitioners' committee members for Save the Garden and a voter in Clearwater, Florida.

2. Save the Garden is an unincorporated association that proposed and is advancing the Clearwater citizens' initiative titled "Voter Approval Required for the Vacation of Public Right-of-Way in the Downtown." The measure would require voter approval before any downtown street can be given away to a private entity.

3. On June 13, 2025, Brooks Gibbs, Jessica Andujar, Tonatiuh "Tony" Tello, Jill Gibbs, and I began the Save the Garden initiative by submitting to the Clerk our petitioners' committee affidavit.

4. The Clerk then issued petition blanks.

5. Over the next months, Save the Garden and its supporters (including the

1

petitioners' committee members) collected thousands of signatures from Clearwater voters. It was and is critical to us that our initiative be placed on the August 2026 ballot—or at the latest the November 2026 ballot—since the City is actively and rapidly moving to finalize right-of-way transfers. Our initiative's goal has been to put our measure to a vote at the earliest opportunity so the people—not politicians—can decide on any pending and future transfers.

6.    Several months into petition collection, on October 7, 2025, the Clerk informed me that one of the five petitioners' committee members, Ms. Andujar, was not a registered Clearwater voter.

7.    The same day, Save the Garden added two additional Clearwater voters—William Mathis and Janice Basler—to the petitioners' committee by filing affidavits with the Clerk.

8.    By the same day, Ms. Andujar submitted a voter registration application, it was accepted, and she was added to the voter rolls.

9.    Requiring the petitioners' committee members to be registered Clearwater voters burdens Save the Garden's supporters' ability to band together with others to advance the initiative. Many individuals who are not registered Clearwater voters support Save the Garden's mission. Some of them are part of the Clearwater community but don't live inside the City limits, or live in Clearwater but are not eligible to vote or choose not to register to vote as a personal choice.

10.    Prohibiting any of these non-voter supporters (including Ms. Andujar before she registered to vote) from joining the petitioners' committee impairs our

2

ability to engage with community members, persuade voters to support Save the Garden, collect petitions, and get our message and ideas out to community members through person-to-person discussion.

11.     On October 23, 2025, the City Clerk answered our question about whether the petitioners' committee could delegate to volunteer circulators by saying "the city charter is clear – the petitioner's committee is responsible for circulating the petitions."

12.     Given her response, we relied on that answer and proceeded to circulate petitions by ourselves (or ensured volunteers collected signatures only in the presence of a committee member). We were trying to be as cautious as possible, given how much scrutiny our effort was under—which his why we tried to seek clarity dating back to June 2025 on how the City interpreted the requirement that the committee members be "responsible for circulating the petition" in the first place.

13.     Limiting circulation to the committee members severely limited the pace of petition collection. With just seven individuals circulating petitions, Save the Garden could only gather a limited number of signatures.

14.     We concluded that collecting 7,067 signatures with just seven circulators would be impossible. We eventually decided in early December 2026 to rely on additional supporters to circulate petitions.

**B. Petition Submission and City's Actions**

15.     On March 17, 2026, Save the Garden submitted 8,051 signatures to the Clerk.

16.    On April 2, the Clerk issued a certificate finding the petition insufficient, which Save the Garden received by certified mail on April 7.

17.    It was important to us that the Clerk's certificate lay out the particulars as to why she found signatures invalid. Knowing the particulars would allow us to determine whether to challenge the Clerk's determination that a signature was invalid, and also how many supplemental petitions we needed to collect and submit to make up the difference.

18.    We knew the Clerk was rejecting some valid petitions. But not knowing the particular reasons why a signature was rejected (and thus whether it was rejected for a legitimate or illegitimate reason) made it impossible to know how many supplemental petitions we actually needed to collect and submit to reach the threshold. Not knowing the particular reasons why a signature was rejected also made it difficult—if not impossible—to determine whether the Clerk rejected a signature for legitimate or illegitimate reasons.

19.    Save the Garden filed a supplementary petition with 701 additional petition signatures on April 17.

20.    On April 22, the Clerk issued an amended certificate still finding the petition insufficient.

21.    On May 20, we notified the City Council of the errors in rejected petitions that we were finding in our audit (described in more detail below).

22.    On May 21, the City Council approved the Clerk's finding that the petition had an insufficient number of signatures.

4

## C. Rejected Petitions

23.    **Inactive Voters:** Save the Garden learned that the Clerk had rejected inactive-status voters' signatures after submitting a public records request for the list of voters the Clerk used to verify their petition. The filename of the list was "ActiveVoterData03252026.xlsx," so we deduced that the list contained only active voters, and that therefore the Clerk had failed to count signatures of inactive voters.

24.    The City of Clearwater has over 15,000 registered voters designated as inactive, as reported in the Pinellas County Supervisor of Elections' most recent voter registration report.

25.    Our "deduction" was confirmed by our audit of the rejected petitions. After the Clerk rejected the petition, we requested documentation of the review process including the voter file used and which signatures were rejected. On April 15, 2026, the Clerk responded to this request by producing the "ActiveVoterData03252026.xlsx" voter file, a spreadsheet summary of the verification process, and a detailed spreadsheet listing each rejected signature and why. Both the spreadsheet summary and detailed spreadsheet are submitted with this declaration.

26.    The Clerk's spreadsheet summary of the verification process reported (for each petition page) the number of signatures (1) submitted, (2) verified, (3) rejected because they were not registered in Clearwater, (4) rejected because the voter record listed a different address, and (5) rejected because it was obtained before Oct. 7, 2025.

27.    The Clerk's more detailed spreadsheet listed for each signature rejected *other* than because it was obtained before Oct. 7, 2025, the following information: (1)

5

the petition page number, (2) the voter's first initial and last name, and (3) notations for why the signature was rejected—registered outside of Clearwater, not registered at all, address mismatch, incomplete address, illegible address or name, etc.

28.    On April 28, 2026, we received in response to a new public records request documents from the Clerk's review of our supplemental petition. These included for the supplemental petitions a summary spreadsheet and a detailed spreadsheet list each rejected signature and why (both submitted with this declaration). The Clerk also provided a voter file containing all of Clearwater's "protected voters" (those whose addresses are private), after she realized that the original voter file she had used to verify petitions omitted protected voters.

29.    Using the detailed spreadsheets the Clerk provided, the voter files she provided, and scans of our submitted petitions, Jill Gibbs and I audited the Clerk's rejected signatures. For a rejected signature noted on the Clerk's detailed spreadsheet, we reviewed the original petition form, compared the information the Clerk recorded on her spreadsheet, and searched for the voter ourselves in the voter file. We then recorded our findings—whether we could find the voter or determine what "went wrong" in the verification process—in our notes as we went along. My notes are submitted with this declaration. As of June 5, we have completed this audit process for about one-third of the petition forms.

30.    **Full Text Attached to Petition Form:** Each petition form that Save the Garden submitted had a circulator's affidavit attesting that each person signing the petition had an opportunity before signing to read the full text of the proposed

6

ordinance. To my knowledge, every petition form Save the Garden circulated had the full text attached to it while it was being circulated.

31. Because the Clerk already had the ordinance full text, and because it was multiple pages long, before submitting signed petitions forms to the Clerk, Save the Garden detached the ordinance full text from each form and submitted only the signed petition forms. This reduced the volume of paper we submitted.

32. Sometimes the full text was stapled to the petition form. Sometimes it was paper-clipped. You can still see the staple-holes on the petitions that had the full text stapled to it.

33. **Signatures Rejected for Other Reasons:** Based on the audit Ms. Gibbs and I are doing, we learned that the Clerk rejected a signature if the voter listed a City of Clearwater address that did not match the address on their voter record (i.e., a voter who had moved and had not yet updated their voting address).

34. Based on our audit, we also learned that the Clerk rejected a signature if the voter listed their street address on their voter record, but omitted an apartment number.

35. Based on our audit, we also learned that the Clerk rejected a signature if a voter wrote down their address, but had a minor mistake in their house number.

36. Based on our audit, we also learned that the Clerk rejected many signatures because the voter's information was entered incorrectly when it was searched.

37. We also found a number of voters who were rejected as "not registered,"

7

but we could determine no explanation for why. As far as we can tell, these voters provided all necessary, correct information to have their signature verified, should have been verified, but were rejected in error.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 5, 2026.

**Kelly Myer**