**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SAVE THE GARDEN, BROOKS GIBBS,
KELLY MYER, JESSICA ANDUJAR,
TONATIUH TELLO, JILL GIBBS,
WILLIAM MATHIS, and JANICE BASLER,
     Plaintiffs,                               Case No. 8:26-cv-01662

v.

CITY OF CLEARWATER,
     Defendant.
_____/

**DEFENDANT, CITY OF CLEARWATER'S CORRECTED**
**RESPONSE TO PLAINTIFF'S TIME-SENSITIVE**
**MOTION FOR PRELIMINARY INJUNCTION**

Defendant, City of Clearwater ("City"), opposes Plaintiffs' time-sensitive motion for a preliminary injunction. (DE 8.) The City also opposes Plaintiffs' incorporated request to consolidate any injunction hearing with trial.

Plaintiffs are the disappointed proponents of an unsuccessful effort to propose an ordinance under the City Charter's initiative process. Four months after they filed the affidavit required to commence the process, the City learned from a citizen complaint that the affidavit—signed by all five of initial proponents—was materially false, and the initiative process never commenced. In that four-month period, they gathered over 4,000 signatures. Here, they claim those signatures should still be counted, among others. As a vehicle for doing so, they sue the City, alleging their First Amendment rights and rights under the City Charter were violated.

1

Plaintiffs cannot carry the heavy burden required for a preliminary injunction to issue. For multiple reasons, they are not likely to prevail on the merits of their First Amendment claim or their claim that the City violated the City Charter. Nor do they make a colorable showing that they are likely to suffer irreparable harm. Significantly here, the equities and public interest do not weigh in Plaintiffs' favor.[1]

## Background and Preliminary Statement

This suit arises from the City's final decision finding Plaintiffs' initiative petition for a proposed ordinance was insufficient under the City Charter. (DE 7.) Plaintiffs are seven individuals who submitted affidavits as members of the petitioners' committee sponsoring the initiative, and the unincorporated association, Save the Garden, by which the petitioners' committee is known. (Ex. 3).[2]

The City Charter provides a mechanism for its electorate to propose an ordinance for adoption by the City Council, and require the City to hold a referendum if the City Council declines to adopt it.  (Ex 1, § 6.01, 6.08.)

**Materially False Affidavit Filed by All Five Initial "Committee" Members**

The motion focuses on the final step in the initiative process—submission to the voters. However, the most critical point in the process for Plaintiffs' petition is

---

[1] The City requests an evidentiary hearing limited to issue the amount of the injunction bond if the Court determines the motion should be granted.

[2] The City Clerk's affidavit is filed as the first attachment to this response. References to "Ex." are exhibits to the affidavit.

actually the point of commencement. Under the City Charter, an initiative petition is commenced by five voters of the City filing a petitioners' committee affidavit and proposed initiative ordinance with the City Clerk. (Ex 1, § 6.04.)

The real blow to Plaintiffs' effort was their own doing. On June 13, 2025, Plaintiffs filed their petitioners' committee affidavit and proposed ordinance. (Ex. 3.) The City later learned that the affidavit—executed by all five of the Plaintiffs who sought to initiate the process—was false. Each of the five affiants stated that all affiants were qualified voters in the City, when one of them, Jessica Andujar, was not. (Exs. 1, 3.)

Four months after filing the affidavit, in October 2025, a member of the public filed a complaint with the City Clerk, reporting that one of the committee members was not a registered voter. (Ex. 4.) The City Clerk confirmed this, and notified Plaintiffs the same day. Plaintiffs obtained two affidavits. Ms. Andujar registered to vote the next day.

**Relief Sought**

The motion frames this as a time-sensitive election law case, with a right to a referendum on the ordinance at stake. The relief they seek, however, shows there is no present right to place the ordinance on the ballot. Plaintiffs ask the Court to order the City to take affirmative actions as preliminary relief:

- Accept various petition signatures as valid

- Issue a corrected certificate regarding the sufficiency of the petition,
- Permit them to gather and submit more signatures in another supplemental petition process, and, if the petition is sufficient after,
- Require the City to place the proposed ordinance on the ballot for the soonest election "feasible"

Even if Plaintiffs could establish the elements of a preliminary injunction, they are not entitled to the particular injunctive relief they seek, which conflicts with the City Charter. Significantly, they ask the Court (1) for a second opportunity to supplement their petition, when the City Charter specifically states a petition can only be supplemented once; and (2) to allow them to skip the critical step of affording the City Council a chance to adopt the ordinance itself. (Ex. 1, § 6.06(a).) Plaintiffs cite no authority that would allow them to short-cut the Charter process or eliminate the City Council's opportunity to vote on the ordinance.

**Plaintiffs Fell Short of the Required Number of Signatures**

Plaintiffs needed at least 7,067 valid signatures. They submitted 8,742, and ; and based on (Exs. 8, 14.) Total signatures submitted: 8752

Total valid signatures: 3211

Section 6.04 of the Charter states that initiative proceedings are commenced by any five voters filing the required affidavit and ordinance with the City Clerk. (Ex. 1.) The initiative petition process did not commence until October 7, 2025, when the petitioners' committee was comprised of five voters with valid affidavits. (Ex. 1.)

Plaintiffs later attempted to "cure" their false affidavit by securing two more voters on the committee, and Ms. Andujar subsequently registered to vote. These actions—which occurred four months after they filed their affidavit—resulted in Plaintiffs collecting 4,000+ votes without an initiative process underway. (Ex. 5.)

Plaintiffs also claim the City failed to count inactive voters, who are not included on the voter rolls provided by the Supervisor of Elections (SOE). This was raised to the City for the first time on May 21, 2026, when the City Council approved the Clerk's certification of their supplemental petition. While the City disagrees that inactive voter signatures may be counted, it nonetheless asked the SOE to provide a list of inactive voters, and reviewed the signatures against that list.

The inactive voter list from the SOE included 1,147 individuals. The City Clerk determined that 178 petition signatures were by voters in the City and would be valid if inactive voters are counted. (Ex. 18.) Even assuming that both "inactive" voters and the pre-October 7 signatures must be considered, the valid signatures submitted for the initiative petition total 6,345. (Clerk Aff. ¶ 47.) Thus, it would still not have the 7,067 valid signatures required.

Through this lawsuit, Plaintiffs now seek to undo the consequences for their own errors.[3]

---

[3] One of the petitioners' committee members, Kelly Myer, actually signed the petition *twice*. (Clerk Aff. ¶ 49.)

5

**Standard of Review**

A district court may grant a preliminary injunction only if the moving party demonstrates that: "(1) it has a substantial likelihood of success on the merits; (2) irreparable injury will be suffered unless the injunction issues; (3) the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam).

A preliminary injunction is a "drastic remedy," and considered "the exception rather than the rule." *Texas v. Seatrain Int'l, S.A.,* 518 F.2d 175, 179 (5th Cir. 1975) (citation omitted). This extraordinary relief should not be granted "unless the movant 'clearly carries the burden of persuasion' as to the four prerequisites." *United States v. Jefferson Cty.*, 720 F.2d 1511, 1519 (11th Cir. 1983) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 573 (11th Cir. 1974)).

**Argument**

The amended complaint contains two counts: (1) a claim for declaratory relief alleging the City violated the City Charter in various respects; and (2) a facial challenge to the voter requirement for petitioners' committee members under 6.04 of the City Charter based on an alleged violation of their First Amendment rights.

Plaintiffs are unable to establish any of the elements for preliminary injunctive relief. Even if they could establish the elements of an injunction, the particular injunctive relief they seek in their motion cannot be granted. If the Court determines that the motion should be granted in any part, the City requests an opportunity to present evidence on the adequate amount of an injunction bond.

## I. Plaintiffs are not likely to succeed on the merits of their First Amendment claim

### a. Plaintiffs cannot establish a likelihood of success on the merits based on a First Amendment claim not pled in their amended complaint

Count II of the complaint alleges the Charter violates the First Amendment by requiring the members of a *petitioners' committee* to be voters. (DE 7 at 66-70.) Specifically, Plaintiffs allege the Charter's "ban on non-voters being members of an initiative petitioners' committee" unduly burdens First Amendment rights by curtailing "debate and discussion of a ballot measure" and "limiting [their] ability to band together with others—including non-voters—to advance citizen initiatives." (DE 8 at 7.)

Because Count II only challenges the requirement that *committee members* be voters, Plaintiffs cannot establish a likelihood of success on the merits of a petition circulator theory, which is not pled.

As discussed below, petition circulators and official proponents of an initiative have distinct roles in the initiative process. The case law that applies to circulators

7

in the First Amendment context does not apply—directly or by analogy—to the official proponents of an initiative, such as the members of a petitioners' committee. The City Charter regulates petitioner committee members minimally and is likely to be upheld.

### b. The City Charter does not require petition circulators to be registered voters

The motion argues the Charter violates the First Amendment by requiring *petition circulators* to be registered voters. (DE 8 at 8.)  Plaintiffs argue they are substantially likely to succeed on the merits of their claim because the "Supreme Court rejected a near-identical requirement that petition circulators be registered voters in *Buckley v. American Constitutional Law Foundation, Inc*., 525 U.S. 182 (1999)." (DE 8 at 7.) They similarly rely on *Meyer v. Grant*, 486 U.S. 414 (1988) (striking down state statute criminalizing payment of petition circulators)).

Plaintiffs are not likely to succeed on a claim brought under a petition circulator theory because (1) they have not pleaded a First Amendment claim under this theory in their amended complaint; and (2) the Charter does not require circulators to be registered voters. (Ex. 1).)

Section 6.04 of the Charter, "Commencement of proceedings," controls how initiative petition proceedings are initiated. It states in full:

> ***Any five voters may commence initiative*** or referendum proceedings by filing with the city clerk or other official designated by the council an ***affidavit stating they will constitute the petitioners' committee and be responsible for***

> *circulating the petition and filing it in proper form*, stating their names and addresses, specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered.

(Ex. 1.)  This provision requires the five members of a *petitioners' committee* to be voters. (*Id.*) The remainder of the paragraph speaks to the content of the affidavit they must file to commence proceedings. (*Id.*)

On its face, Section 6.04 does not impose a voter registration requirement on petition circulators. It requires the petitioners' committee affidavit to state the committee will be "responsible for circulating the petition and filing it in proper form." *Id.* This speaks to the official role the petitioners' committee plays in the initiative process. The fact that the committee is "responsible for" circulating the petition does not translate into a requirement that only registered voters (the committee members, or otherwise) are allowed to circulate petitions.

Further, Section 6.05(c) specifically applies to petition "circulator[s]." Nothing in this subsection restricts circulators to registered voters. The use of the term "circulator," rather than "petitioners' committee," shows that Section 6.04 does not restrict who can collect signatures. If the only people who could circulate petitions were committee members, there would be no reason to call them something different in Section 6.05(c).

Even if the "responsible for circulating" language could be read that way, it is not the only reasonable reading. Another reasonable interpretation of "responsible for circulating" is that the committee members have ultimate or oversight responsibility for the petition-circulation process, as the official proponent of the initiative.

It is well-established that a "statute should be interpreted in a way that avoids placing its constitutionality in doubt." *West Virginia v. United States Dep't of the Treasury*, 82 F.4th 1068, 1086 (11th Cir. 2023) (citations omitted) ("[E]very reasonable construction must be resorted to, in order to save a statute from unconstitutionality."). Therefore, "if an otherwise acceptable construction of a statute would raise serious constitutional problems, and where an alternative interpretation of the statute is 'fairly possible,' [courts] are obligated to construe the statute to avoid such problems." *Id.* (citations omitted).

The Charter cannot be interpreted in a way that renders it an unconstitutional restriction on petition circulation. A reasonable alternative interpretation—that it refers to ultimate or oversight responsibility—is "fairly possible." *Id.* That is the interpretation that must be applied.

### c. The First Amendment framework for petition circulators under *Meyers* and *Buckley* is inapplicable to initiative proponent

10

The Eleventh Circuit has consistently held that "regulations protecting the integrity of the initiative process are 'subject to strict scrutiny only in certain narrow circumstances.'" *Fla. Decides Healthcare, Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 LX 353753 (11th Cir. Sep. 9, 2025) (citing *Biddulph v. Mortham*, 89 F.3d 1491, 1500 (11th Cir. 1996)). In this context, strict scrutiny review of a regulation is "content based or had a disparate impact on certain political viewpoints," is enforced "in a discriminatory manner," or amounts to an impermissible burden on "the free exchange of ideas about the objective of an initiative proposal.'" *Id.* (citing *Biddulph*, 89 F.3d at 1500.

In addressing the reach of the cases Plaintiffs rely on in their motion, the Eleventh Circuit concluded that *Meyer* and *Buckley* require "strict scrutiny of a law regulating the initiative process ***only*** if the challenged law '***substantially restricts political discussion*** of the issue [the sponsor] is seeking to put on the ballot." *Id.* "If the regulated conduct is ***not inherently expressive***, then the residency and citizenship requirements ***need only be reviewed for a rational basis.***" *Id.*

In *Fla. Decides Healthcare,* the Eleventh Circuit concluded strict scrutiny under *Meyer* and *Buckley* did not apply to Florida's recent legislation requiring petition circulators for sate petitions to register as circulators if they gather more than 25 signatures, imposing residency requirements, and other regulations. *Id.* The court reasoned that the statute's "residency and citizenship requirements do ***not***

*restrict* any ***speech elements*** of the petition-circulation process. Instead, they only regulate who can 'collect signatures or initiative petitions.'" Because this does not substantially restrict political discussion, rational basis review applied. *Id.*

Here, Plaintiffs likewise rely on the framework that applies to petition circulators under *Meyers* and *Buckly.* They go so far as to claim that the restrictions in the City Charter are "near-identical" to those in *Buckley.* The restrictions in *Buckley* did not apply to official initiative proponents—they only applied to circulators. At issue in *Buckley* were "three conditions Colorado places on the ballot-initiative process: (1) the requirement that initiative-petition circulators be registered voters[]; (2) the requirement that they wear an identification badge bearing the circulator's name[]; and (3) the requirement that proponents of an initiative report the names and addresses of all paid circulators and the amount paid to each circulators." *Buckley*, 525 U.S. at 186.. *See also Meyer v. Grant*, 486 U.S. 414 (1988) (striking down state statute criminalizing payment of petition circulators).

The City Charter contains no "near-identical" regulations. The *only* regulation it imposes on circulators is the requirement to submit an affidavit with collected signatures. That requirement has not been challenged.

Because nothing in Charter requires petition circulators to be registered voters, and no claim on that basis has been raised in the complaint, Plaintiffs are not entitled to injunctive relief on that basis.

**d. Preliminary injunctive relief has been denied based on language virtually identical to the Section 6.04 of the City Charter**

Plaintiffs have a low likelihood of success on the merits of their First Amendment claim challenging the voter requirement for *petitioners' committee members*.

In March 2026, the Nevada District Court denied a motion for a preliminary injunction in a First Amendment challenge to an identical provision in Nevada's local initiative statute. *Greer v. Aguilar*, No. 2:25-cv-025, 2026 U.S. Dist. LEXIS 42821, at *1-2 (D. Nev. Mar. 3, 2026). Like the City Charter, the Nevada statute requires five local registered voters to sponsor the initiative petition and for those voters to be residents of that county or city in question:

| Nev. Rev. Stat. § 295.095(1) | City Charter Section 6.04 |
|---|---|
| "Any five registered voters of the county may commence initiative or referendum proceedings by filing with the county clerk an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses and specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered." | "Any five voters may commence initiative or referendum proceedings by filing with the city clerk or other official designated by the council an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses, specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered." |

Like the Plaintiffs here, in *Greer*, the proponent argued he was likely to succeed on his First Amendment claim, urging it was subject to strict scrutiny. *Id.*

The court disagreed. In rejecting this argument under Ninth Circuit precedent, the court explained that "[t]he First Amendment permits states 'considerable leeway' in regulating the electoral process, provided their choices do not produce 'undue hindrances to political conversations and the exchange of ideas.'" *Id.* at *2. Therefore, in this context, "only where the challenged law severely burdens the ability to place an initiative on the ballot" must it "be narrowly tailored and advance a compelling state interest." *Id.* Absent such a sever burden, courts apply a "'less exacting' standard of review, and the law will be upheld if it serves 'an important regulatory interest.'" *Id.* (citations omitted).

*Greer* distinguished the First Amendment cases addressing circulators of petitions. *Id.* The act of circulating petitions involves core political speech. But residency, registration, disclosure, and similar restrictions on "official proponents of an initiative do not warrant strict scrutiny." *Id.* Therefore, the court rejected the proponent's reliance on the First Amendment framework in *Meyers* and *Buckley*, explaining:

> The cases Greer relies on, such as *Nader v. Brewer*, 531 F.3d 1028, 1035 (9th Cir. 2008) and [*Buckley v. Am.*] do not alter this result. Those cases applied strict scrutiny and struck down residency and disclosure requirements on petition circulators—those who actually engage in direct voter contact—because such requirements unnecessarily restrict their speech and associational rights. *See, e.g.*, *Nader*, 531 F.3d at 1036. But the Ninth Circuit has distinguished those cases from residency requirements for those acting as an official proponent, noting that the official proponent is a unique, quasi-legislative role that the government may constitutionally restrict.

*Id.* at *7 n.32 (citing *Chula Vista Citizens*, 782 F.3d at 533).

Initiative proponents are treated differently because of their official role in the legislative process. *Id.* Because of that unique role, "states and cities may, wholly consistent with the First Amendment, require that those who seek to propose legislation…be electors' because official proponents 'play a special role with unique responsibilities and powers in the legislative process.'" *Id.*

Requiring official proponents to be voters in the relevant city or county serves important regulatory interests of protecting the integrity of the initiative process and ensuring that local initiatives have some minimal degree of local support. *Id.* Additionally, government has an "interest in limiting participation in that government to those who are within the basic conception of a political community," "defin[ing] its political community[.]" *Greer*, 2026 U.S. Dist. LEXIS 42821, at *9.

Significantly, the Nevada statute's voter requirement for committee members was logically related to those regulatory interests: "[t]he elector requirement operates to ensure that those who exercise this unique legislative power are members of the political community who will be bound by the proposed initiative should it become law." *Id. See Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 536 (9th Cir. 2015) ("plaintiffs rely upon cases that prohibit the disclosure of the identity of petition *circulators*—a role distinct from that of an initiative proponent or a petition signatory." (emphasis added).)

15

**e. The level of scrutiny applied by *Greer* is higher than the standard that applies under Eleventh Circuit precedent.**

Even under the greater level of scrutiny that applies in the Ninth Circuit, Nevada's registration requirement with the same language as the City Charter easily passed constitutional muster.

Under the test the Eleventh Circuit recently reiterated in *Fla. Decides Healthcare*, requiring petitioners' committee members to be voters in the City is subject to rational basis review. The requirement to register does not substantially restrict discussion of the issue an initiative proponent seeks to advance. The requirement to form a committee of five voters in the City does not impermissibly burden the ability to engage in the initiative process. Members of a committee remain free to engage in discussion and advocacy of the initiative. Individuals who are not registered voters remain free to do the same.

Therefore, the voter requirement for committee members is very likely to be upheld. Because Plaintiffs cannot establish they are substantially likely to prevail on the merits Count II, preliminary injunctive relief cannot be granted on this basis.

**II.    Plaintiffs are unlikely to succeed on the merits of their claim for declaratory judgment in Count I, claiming the City violated the City Charter**

16

### a. The pre-October 7 signatures were collected before initiative proceedings commenced under Section 6.04

The false affidavit filed by the five affiants, consisting of only four voters in the City, did not trigger the initiative process. It was undisputed that Ms. Andujar was not a registered voter, and that all five committee members attested to the contrary. Section 4.06 specifies how proceedings are commenced: "Any five voters may commence initiative or referendum proceedings by filing with the city clerk or other official designated by the council an affidavit…." No initiative process existed until October 7, 2025. The signatures collected before then were not invalidated, they were collected before the petition process started.

### b. "Inactive" voters are not entitled to sign and their signatures should not be counted

Plaintiffs claim that, because the City Charter does not state that only active voters can sign a petition, "inactive" voter signatures must be counted.

The position that inactive voters should be counted was for the first time on May 21, 2026, when the City Council approved the City Clerk's certification of the supplemental petition. The City Clerk has since obtained an inactive list from the SOE, and reviewed all signatures that could not previously be verified. (Clerk Aff. ¶ 44-48 & Ex. 18). Only 178 inactive voter signatures would be valid, if counted. (*Id.*) Therefore, Plaintiffs would still fall short of the required number.

Turing to Plaintiffs' legal position, the only authority the motion cites to support their position is section 98.065(4)(b), Florida Statutes. The motion omits that

this exact subparagraph also states: "Names on the inactive list may ***not*** be used to calculate the number of signatures needed on ***any*** petition." *Id.* (emphasis added).

Earlier this year, the First District similarly held that the Secretary of State had authority to issue a directive to SOEs requiring them to invalidate petitions signed by inactive voters in statewide petitions. *Byrd v. Smart & Safe Fla.*, 51 Fla. L. Weekly D166 (Fla. 1st DCA Jan. 23, 2026).

Therefore, inactive voters are not allowed to sign petitions, and the SOEs do not include inactive voters on voter rolls. The City must rely on the SOE to maintain and provide copies of voter rolls. *See* § 98.065(1), Fla. Stat (SOEs record maintenance practices accurate and current voter registration records"). When the City requested a voter roll from the SOE, the active voter list was provided. § 98.065(4)(b).

The City Charter is not silent on who is qualified to vote in the City.  Section 8.02 states: "A person who is a resident of the city who has qualified as a voter of Florida, and Pinellas County, and who registers in the procedural manner prescribed by law, shall be a qualified voter of the city." (Ex. 2 at § 8.02.) A voter on the inactive list who has not been restored has conceivably has failed to follow the procedural manner required. For these reasons, inactive voter signatures should not be counted.

**c.  The City Clerk's review and validation is presumed correct**

18

The "judgment of officials duly charged with carrying out the election process should be presumed correct if reasonable and not in derogation of the law." *Krivanek v. Take Back Tampa Political Comm.*, 625 So. 2d 840, 844-45 (Fla. 1993).(citations omitted). The Supreme Court has held that a "similar latitude of judgment should be accorded to election officials in carrying out the process of validating signature petitions." *Krivanek v. Take Back Tampa Political Comm.*, 625 So. 2d 840, 844-45 (Fla. 1993).

Plaintiffs merely take issue with the reasonable exercise of judgment by the City Clerk in determining whether a signature is legible, a match, or others. aspects of her review. Further, it appears Plaintiffs' review of the signatures has contacted individuals who signed the petition in an effort to gather information to validate them. For example, Kelly Myers' wrote a note by a person's name on a voter list stating: "Emailed." (DE 8-13.) Plaintiffs' efforts to Monday morning quarterback should be rejected and the Clerk's reasonable, good faith judgment should be upheld.

## III. There is no risk of irreparable harm and the public interest will not be served in this case

No irreparable harm that will result without an injunction. Plaintiffs have not identified any harm, other than the legal assertion that their rights are being violated. At most, Plaintiffs show a desire to stop public rights of way in the Downtown District from being vacated by the City while this litigation is pending.

19

Additionally, the time for the City to submit new ballot language to the SOE for the August 2026 election has expired. The deadline imposed by the SOE was June 12, 2026. (Ex. 19-20.) Even if that deadline could be adjusted, and even if the petition would be sufficient without gathering additional, the City Council would have 60 days in which to adopt the ordinance. Further, the Charter prohibits any referendum from being held less than 90 days from the date of the certificate of sufficiency. There is no imminent election on the line.

**IV. If the motion is granted, Plaintiffs should be required to provide an injunction bond in the amount of the estimated cost of a referendum election**

If the motion is granted, an injunction bond in an amount at least equal to the estimated cost of holding a referendum election should be required. The SOE has provided the City with an estimate of $134,279.41 for a special election in March 2027. (Ex. 20.) Currently, the City does not have a local election scheduled for that date. Therefore, the amount of the estimate would be the cost incurred to place the Plaintiff's ordinance on the ballot.

**V. If adopted, the proposed ordinance would violate the Florida Constitution because it would require a referendum process in relation to development regulation, in conflict section 163.3167, Florida Statutes**

A municipal law is unconstitutional if it conflicts with a Florida statute. Art. VIII, § 2(b), Fla. Const. Here, the initiative ordinance would be unconstitutional if adopted, as it conflicts with section 163.3167(8), Florida Statutes. For this

independent reason, the motion should be denied. *Mullen v. Bal Harbour* Vill., 241 So. 3d 949, 951 (Fla. 3d DCA 2018) ("The trial court properly denied plaintiffs their requested injunctive relief because it correctly held that Petition 82 would constitute an illegal referendum because it conflicted with § 163.3167(8)(a)[], which prohibited any initiative or referendum process in regard to any development order.").

Section 163.3167 prohibits any "initiative or referendum process in regard to" any development order, any development regulation, comprehensive plan, or map amendment. Most recently expanded in 2023, the statute clearly expresses the legislature's intent to bar any initiative and referendum process in regard to development regulation. *Archstone Palmetto PARK, LLC v. City of Boca Raton*, No. 4D12-4554, 39 Fla. L. Weekly D 230a, (Fla. 4th DCA 2014); *City of Riviera Beach v. Riviera Beach Citizens* , Nos. 4D10-4770; 4D10-4813, 37 Fla. L. Weekly D 788a (Fla. 4th DCA 2010); Fla. Op. Att'y Gen. 2017-03.

Under chapter 163, Florida Statutes, a "land development regulation" means "an ordinance enacted by a local governing body for the regulation of any aspect of development, including a subdivision, building construction, landscaping, tree protection, or sign regulation or any other regulation concerning the development of land." § 163.3231(2)(b), Fla. Stat. A "development order" is "any order granting, denying, or granting with conditions an application for a development permit." §

21

163.3164, Fla. Stat. "Development permit," in turn, "includes any building permit, zoning permit, subdivision approval, rezoning, certification, special exception, variance, or any other official action of local government having the effect of permitting the development of land." § 163.3164, Fla. Stat.

Here, the proposed ordinance requires referendum approval to vacate rights-of-way within the City's Downtown District, a zoning district under the City's Development Code. (Ex, 22.) This is the only zoning district the ordinance applies to. The permitted uses and applicable approval requirements for all land in with this zoning is subject to the Downtown District and Appendix C. (Ex. 22.)

The proposed ordinance would require approval before a public right-of-way is vacated in the Downtown District.  Section 1 of the proposed ordinance provides:

> Right-of-way means any land or interest in land, whether improved or unimproved, dedicated or otherwise set aside for public use, including but not limited to streets, sidewalks, alleys, easements, and public pathways.

(Ex. 3 at § 1.) Section 2 of the proposed ordinance broadly states:

> No vacation of public right-of-way, in whole or in part, located within the Downtown Clearwater Community Redevelopment Area (DTCRA) shall be valid or effective unless first approved by a majority of the electors of the City of Clearwater voting in a municipal or special referendum.

> For purposes of this ordinance, any agreement, lease, license, or public-private partnership that results in the long-term exclusive use, management, or effective control of a public right-of-way by a private or religious entity shall be treated as a vacation and shall also require voter approval under this section.

> For the purposes of this ordinance, "effective control" shall be defined as any agreement, lease, license, or arrangement that grants a private or religious entity decision-making authority over the access, use, or operation of a public right-of-way for a period exceeding twelve months, or that otherwise restricts general public access in practice.

While Section 4 of the proposed ordinance provides limited exceptions, to the referendum requirement (Ex. 3.), the exceptions would be inapplicable and the referendum requirement would apply if private parties are involved. To use an exception, the City Council must be able to certify, among other things:

> That it is *not associated with or intended to benefit* a *private development entity*, as demonstrated through documented findings, public disclosures, and review of relevant property ownership records, financial interests, and *development plans presented at the meeting*.

(Ex. 3 at § 4) (Emphasis added.) Plaintiffs did not identify in the proposed ordinance where among the City's codes it would be located if adopted. Based on the sweeping language in the proposed ordinance reaching various aspects of use and development, it could logically fit in the Community Development Code. Given that the ordinance specifically only applies to a single zoning district—the Downtown District—Appendix C, governing use and development in the Downtown District, is an option.

The proposed ordinance will require a referendum when various types of actions are taken in relation to the use and development of land underlying rights of way and other land in the Downtown District.

23

Even ignoring the extensive reach of other provisions, the definition of right-of-way illustrates the ordinance has a far greater reach than a standard vacation ordinance: A right of way is "***any land or interest in land***, whether improved or unimproved, dedicated or otherwise set aside for public use, ***including but not limited to*** streets, sidewalks, alleys, easements, and public pathways." (Ex. 3 at § 1.) "Vacation" is defined as "the act of legally abandoning, discontinuing, or extinguishing the public's interest in a right-of-way." Taken together, the proposed ordinance applies to the City "discontinuing" its use of "any land or interest in land" "set aside for public use," even land that is already "improved." Therefore, for an example, if any land of interest in land set aside for public use is discontinued by the City, the referendum requirement would be triggered.

Furthermore, the adoption of the ordinance would require the City to amend its Community Development Code by ordinance of the City Council. Under Appendix C, Section C-902, it would specifically require a text amendment:

> Section C-902. - Amending street types and key corners.
>
> ***Changing a designated street type*** or key corner designation requires an amendment to Figure 2. Regulating Plan—Street Types and Key Corners, which is a ***text amendment***. Text amendments will be processed in accordance with Section 4-601. ***A request to amend a street type or key corner designation must also include an application for development approval.***
>
> In the Downtown District, the type of street a property abuts directly impacts

The design standards in the Downtown District are also impacted by the type of

24

street a property abuts.  Street Types and Key Corners establishes the applicability of development standards [that apply to the Downtown District] based on a site's location along streets and at key corner locations." (Ex. 22 at ss C-203.). "Along existing or proposed new streets or for properties where street types are not depicted on the Regulating Plan...as part of an application for development approval." (*Id.*)

The effect of Plaintiffs' ordinance would be to require a referendum "in regard to" development regulation.[4] For this reason, if adopted, the ordinance will be facially invalid under the Florida Constitution. While the ordinance has a severability provision, its entire purpose is to subject action to referendum. Therefore, the referendum requirements cannot be severed. The unconstitutional ordinance should not make it to the voters.

## Conclusion

Plaintiffs have failed to carry their burden. Their motion should be denied in full. If it is not, the City requests an opportunity to prevent evidence on the amount of an injunction bond.

> *s/Elizabeth W. Neiberger*
> Elizabeth W. Neiberger
> FL Bar No. 70102
> BRYANT MILLER OLIVE P.A.
> One S.E. Third Avenue, Suite 2200
> Miami, FL 33131

---

[4] For example, if right-of-way is vacated, its use has changes and underlying land becomes developable. ights-of-way vacations usually occur in connection with a property owner's application for development approval.

25

(305) 374-7349 (Tel)
(305) 374-0895 (Fax)
eneiberger@bmolaw.com
akilpatrick@bmolaw.com
*Lead Counsel for Defendant, City of Clearwater*

## CERTIFICATE OF SERVICE

I hereby certify that, on June 16, 2026, this document was filed electronically with the clerk of the court by using the CM/ECF system, and a copy was served by email on the persons identified on the Service List below.

*s/Elizabeth W. Neiberger*
Elizabeth W. Neiberger

### Service List

Nicholas L.V. Warren, Esq.
Daniel B. Tilley, Esq.
ACLU Foundation of Florida
4343 West Flagler Street, Suite 400
Miami, FL 33134
nwarren@aclufl.org
dtilley@aclufl.org
*Attorneys for Plaintiffs*

26