**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

SAVE THE GARDEN et al.,

     Plaintiffs,

v.                                                          Case No. 8:26-cv-1662-KKM-AEP

CITY OF CLEARWATER,

     Defendant.

_____

**ORDER**

     The plaintiffs sue the City of Clearwater for violations of the city charter and the First Amendment, *see* Am. Compl. (Doc. 7), and move to preliminarily enjoin the City from enforcing its petition practices, Mot. for Prelim. Inj. (MPI) (Doc. 8) at 14. The plaintiffs seek a preliminary injunction requiring the City to accept as valid various signatures and petition forms, issue a corrected certificate regarding the petition's sufficiency, permit the plaintiffs to file a supplementary petition, and, if sufficient, to submit the proposed ordinance to the voters. *See id.* at 14–15. Because the plaintiffs fail to demonstrate a substantial likelihood of success on the merits of their First Amendment or charter-based claims and that, absent an injunction, they will suffer irreparable injury from the violations of the charter, I deny the motion.

## I.    BACKGROUND

"Plaintiff Save the Garden is an unincorporated association formed to propose and advance the Clearwater citizens' initiative titled 'Voter Approval Required for the Vacation of Public Right-of-Way in the Downtown.'" Am. Compl. ¶ 7. "Plaintiffs Brooks Gibbs, Kelly Myer, Jessica Andujar, Tonatiuh 'Tony' Tello, Jill Gibbs, William Mathis, and Janice Basler are Clearwater voters who together constitute the petitioners' committee for the Save the Garden initiative." *Id.* ¶ 8.

The City's charter grants the right to "propose ordinances to the council, and, if the council fails to adopt an ordinance so proposed without any change in substance, to adopt or reject it at a city election." Charter (Doc. 18-2) § 6.01. This right is limited to "[t]he voters of the city." *Id.* The initiative proceedings commence when "[a]ny five voters . . . fil[e] with the city clerk or other official designated by the council an affidavit stating they will constitute the petitioners' committee and be responsible for circulating the petition and filing it in proper form, stating their names and addresses, specifying the address to which all notices to the committee are to be sent, and setting out in full the proposed initiative ordinance or citing the ordinance sought to be reconsidered." *Id.* § 6.04. "After the petitioners' committee affidavit is filed, the Clerk then issues blank petition forms, and petition circulation begins." Am. Compl. ¶ 12 (citing Charter § 6.04).

"Initiative . . . petitions must be signed by voters of the city equal in number to at least ten percent of the total number of voters registered to vote in the last regular city election." Charter § 6.05(a). During circulation of the petition, "the full text of the ordinance proposed" must be contained within the petition or attached to it. *Id.* § 6.05(b). At the time they are filed, each petition paper must attach "an affidavit executed by the circulator thereof stating: That the circulator personally circulated the paper; the number of signatures thereon; that all the signatures were affixed in circulator's presence; that the circulator believes them to be the genuine signatures of the persons whose names they purport to be; and that each signer had an opportunity before signing to read the full text of the ordinance proposed or sought to be reconsidered." *Id.* § 6.05(c).

Once a petition is submitted, the City clerk has twenty days to "complete a certificate as to its sufficiency." *Id.* § 6.06(a). The certificate must specify "the particulars wherein [the petition] is insufficient[.]" *Id.* A petition may be deemed insufficient only if it fails to adhere to the requirements of § 6.05. *See id.* A petition that is "certified insufficient for lack of the required number of valid signatures may be amended once if the petitioners' committee files a notice of intention to amend with the city clerk or other official designated by the council within two working days after receiving the copy of the city clerk's certificate and files a supplementary petition within ten days after receiving

the copy of such certificate." *Id.* "If the amended petition is still deemed insufficient, the petitioner's committee has the right to request a review by the City Council." Am. Compl. ¶ 16 (citing Charter § 6.06(b)).

If a petition is deemed sufficient, the City Council "shall promptly consider the proposed initiative ordinance[.]" Charter § 6.08(a). "If the council fails to adopt a proposed initiative ordinance without any change in substance within 60 days . . . it shall submit the proposed . . . ordinance to the voters of the city." *Id.* "The vote of the city on a proposed . . . ordinance shall be held not less than 90 days and not later than 150 days from the date that the petition was determined sufficient." *Id.* § 6.08(b).

On June 13, 2025, the individual plaintiffs "submitt[ed] to the Clerk the affidavit required by Charter Section 6.04" to begin the Save the Garden initiative. Am. Compl. ¶ 19. After the clerk issued the blank petition forms, "Save the Garden and its supporters collected thousands of signatures from Clearwater voters." *Id.* ¶¶ 20–21.

On October 7, 2025, the clerk informed Kelly Myer that Jessica Andujar was not a registered Clearwater voter, as required under the charter to be a member of a petition committee. *See id.* ¶ 22. The same day, Save the Garden added two additional Clearwater voters—William Mathis and Janice Basler— to the petitioners' committee and filed affidavits with the clerk. *Id.* ¶ 23.

4

Andujar also submitted a voter registration application and joined the voter rolls on October 8, 2025. *Id.* ¶ 24.

"On March 17, 2026, Save the Garden submitted 8,051 signatures to the Clerk." *Id.* ¶ 31. "In the last regular Clearwater election, there were 70,675 registered voters." *Id.* ¶ 18. Thus, at least 7,067 voters needed to sign the petition to be sufficient. *See id.* On April 2, 2026, the clerk issued a certificate of insufficiency for the petition. *See id.* ¶ 32; Initial Certificate (Doc. 8-7) ¶¶ 15–16 (finding the petition insufficient because of a lack of enough valid signatures and failure to include or attach the full text of the proposed ordinance). Save the Garden filed a supplementary petition with 701 additional signatures on April 17, 2026. *See* Am. Compl. ¶ 33. On April 22, 2026, the clerk issued an amended certificate of insufficiency. *Id.* ¶ 34; *see* Am. Certificate (Doc. 8-8) ¶¶ 24–25 (finding the supplementary petition insufficient again because of a lack of enough valid signatures and failure to include or attach the full text of the proposed ordinance). On May 21, 2026, "the City Council approved the Clerk's finding that the petition had an insufficient number of signatures." Am. Compl. ¶ 35.

The clerk rejected the petition on several scores. First, the clerk discounted signatures from voters who are considered "inactive" under Florida law, which totaled 1,147. *Id.* ¶¶ 36–42; Call Aff. (Doc. 18-1) ¶¶ 44–46. The clerk also rejected other signatures because of mismatched addresses, scrivener's

errors by the voter, and errors in searching the voter roll. *See* Am. Compl. ¶ 54. Second, the clerk did not include the 4,306 signatures that Save the Garden collected before October 7, 2025, when the committee lacked at least five voters as required by the charter. *See id.* ¶ 43. Lastly, "the Clerk found the petition insufficient because '[t]he petitions submitted [] did not contain the full text of the proposed ordinance or have attached hereto the proposed ordinance.'" *Id.* ¶ 51.

On May 22, 2026, Save the Garden sued the City in the Circuit Court of the Sixth Judicial Circuit, in and for Pinellas County, Florida. Notice of Removal (Doc. 1) at 1. On June 4, 2026, the City removed the action to this Court. *Id.* The amended complaint asserts two claims. Count I seeks a declaratory judgment that the clerk's rejection of signatures and failure to provide a sufficiently detailed certificate of insufficiency violated the charter. *See* Am. Compl. ¶¶ 61–65. Count II brings a Section 1983 claim that the charter's requirement that members of an initiative petition committee be voters violates the First Amendment by unduly burdening the right of free speech and association. *See id.* ¶¶ 66–70.

The City responds in opposition to the motion for preliminary injunction. Resp. (Doc. 18). After receiving leave to do so, the plaintiffs reply in support of their motion. Reply (Doc. 23).

## II.   LEGAL STANDARDS

To receive a preliminary injunction, a movant must establish (1) "a substantial likelihood of success on the merits"; (2) "irreparable injury" without an injunction; (3) "the threatened injury to the movant outweighs whatever damage the proposed injunction may cause the opposing party; and (4) if issued, the injunction would not be adverse to the public interest." *Siegel v. LePore*, 234 F.3d 1163, 1176 (11th Cir. 2000) (en banc) (per curiam); *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts may not grant a preliminary injunction "unless the movant clearly establishes the burden of persuasion as to the four requisites." *All Care Nursing Serv., Inc. v. Bethesda Mem'l Hosp., Inc.*, 887 F.2d 1535, 1537 (11th Cir. 1989) (citation modified). Accordingly, "[f]ailure to show any of the four factors is fatal." *Am. C.L. Union of Fla., Inc. v. Miami-Dade Cty. Sch. Bd.*, 557 F.3d 1177, 1198 (11th Cir. 2009).

## III.   ANALYSIS

### A. First Amendment Claim

I begin with the First Amendment claim. Because the city charter assigns the "responsib[ility] for circulating the petition and filing it in proper form" to the committee, Charter § 6.04, the plaintiffs argue that the requirement that the initiative petition committee consist of registered voters infringes on the First Amendment because "[t]he Supreme Court rejected a near-identical requirement that petition circulators be registered voters," MPI

7

at 7 (citing *Buckley v. Am. Const. L. Found., Inc.*, 525 U.S. 182 (1999)). The City responds that *Buckley* does not apply to the initiative committee, but instead concerned the individuals circulating the petition. *See* Resp. at 10–12. The City presents the better legal argument under precedent, and thus the preliminary injunction is denied on the First Amendment ground.

In *Buckley*, the Supreme Court held that, because circulators' activity involves "one-on-one communication" necessitating "both the expression of a desire for political change and a discussion of the merits of the proposed change," Colorado unconstitutionally burdened political expression by requiring that petition circulators be registered voters. *See Buckley*, 525 U.S. at 195, 199 (quoting *Meyer v. Grant*, 486 U.S. 414, 421 (1988)). The requirement "decreased the pool of potential circulators" and "limited the number of voices who will convey the initiative proponents' message," consequently "cutting down the size of the audience proponents can reach." *Id.* at 195–96 (citation modified). Because precedent determined that "circulation of a petition involves the type of interactive communication concerning political change that is appropriately described as 'core political speech,' " *Meyer*, 486 U.S. at 421–22, the impact from the registered voter requirement rendered it unconstitutional, *see Buckley*, 525 U.S. at 195–96.[1]

---

[1] As Justice Thomas's concurrence notes, the majority opinion did not apply the "now-settled approach" of the tiers of scrutiny, initially leaving unclear what test should

8

The plaintiffs contend that, because the charter makes the committee members responsible for circulating the petition, this "ties the committee members to the core political speech *Buckley* protects" and subjects the requirement to strict scrutiny. *See* Reply at 5–6; Charter § 6.04. They do not expound on this argument or identify any case law that supports expanding *Buckley*'s concern with circulators to ballot initiative committee members.

As the City points out, the charter imposes no restrictions on petition circulators similar to the restrictions in *Buckley* nor does the charter limit circulators to the committee members. *See* Resp. at 12; *see generally* Charter. Although the charter makes the committee members "responsible for circulating the petition and filing it in proper form" with the clerk, Charter § 6.04, nothing curtails recruiting circulators, whether registered voters or not, to collect signatures, *see* Resp. 9–10 (explaining that the Charter does not limit circulators to the members of the petitioners' committee). Indeed, the plaintiffs relied on circulators other than committee members and the clerk did not reject any signatures because they were collected by non-committee members. *See* Am. Compl. ¶¶ 29–30. Further, the challenged requirement that the

---

be applied. *See Buckley*, 525 U.S. at 206 (Thomas, J., concurring in the judgment). Following *Buckley*, the Eleventh Circuit "reads *Meyer* and its progeny as requiring 'exacting' or strict scrutiny of a law regulating the initiative process only if the challenged law 'substantially restricts *political discussion* of the issue the sponsor is seeking to put on the ballot.'" *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *4 (11th Cir. Sept. 9, 2025) (citation modified).

9

committee be comprised of registered voters does not have the same effect as the *Buckley* restrictions. Mandating that the petition committee consist of registered voters does not decrease the number of potential circulators, limit the number of voices conveying the proponents' message, or reduce the size of the audience the proponents can reach.

Importantly, *Buckley* addresses only petition circulation, not petition initiation. That distinction is dispositive for purposes of the First Amendment in this context. Unlike petition circulation, which implicates core political speech, petition initiatives "derive from wholly state-created procedures by which issues that might otherwise be considered by elected representatives may be put to the voting populace." *Gibson v. Firestone*, 741 F.2d 1268, 1273 (11th Cir. 1984); *see Little v. Reclaim Idaho*, 591 U.S. 1060, 1061–62 (2020) (Roberts, C.J., concurring in the grant of stay) ("Nothing in the Constitution requires Idaho or any other State to provide for ballot initiatives."); *Biddulph v. Mortham*, 89 F.3d 1491, 1497 n.5 (11th Cir. 1996) (per curiam) ("[T]he right to propose legislation by citizen initiative is not guaranteed by the United States Constitution but is a state-created right. Thus, the sort of petitioning occurring in the citizen initiative is not guaranteed by the Petition Clause in the first place."). "States allowing ballot initiatives have considerable leeway to protect the integrity and reliability of the initiative process, as they have with respect to election processes generally." *Buckley*, 525 U.S. at 191–92

10

(citing *Biddulph*, 89 F.3d at 1494, 1500–01). "[A] state's broad discretion in administering its initiative process is subject to strict scrutiny only in certain narrow circumstances," *Biddulph*, 89 F.3d at 1500, including when "a regulation is 'content based or had a disparate impact on certain political viewpoints,' is enforced 'in a discriminatory manner,' or amounts to an impermissible burden on 'the free exchange of ideas about the objective of an initiative proposal,' " *Fla. Decides Healthcare Inc. v. Fla. Sec'y of State*, No. 25-12370, 2025 WL 3738554, at *3 (11th Cir. Sept. 9, 2025) (quoting *Biddulph*, 89 F.3d at 1500). "Most restrictions a state might impose on its initiative process would not implicate First Amendment concerns." *Biddulph*, 89 F.3d at 1500.

The charter's requirement that ballot initiative committee members be voters is not content based and there are no allegations that it has a disparate impact on certain political viewpoints or is enforced in a discriminatory manner. Even if the plaintiffs' argument that the requirement ties the committee to core political speech is construed as an argument that the requirement is an impermissible burden on the free exchange of ideas about the objective of an initiative proposal, the plaintiffs fail to expound on this contention. *See* Reply at 5–6. And none is apparent. Thus, the plaintiffs are wrong that strict scrutiny must be applied. *See Chula Vista Citizens for Jobs & Fair Competition v. Norris*, 782 F.3d 520, 529 (9th Cir. 2015) (holding that a requirement that sponsors of local ballot initiatives be electors did "not impose

11

any meaningful burden on First Amendment rights" because the power to commence a ballot initiative is "a legislative power").

The plaintiffs' argument for substantial likelihood of success hinges on concluding that the charter restricts core political speech and applying strict scrutiny. *See* MPI at 7–8; Reply at 5–6. The plaintiffs do not advance other arguments. But even if the plaintiffs had argued that the requirement failed under intermediate scrutiny or rational basis review, the City would likely prevail. The City has "an important interest—indeed, a compelling one—in securing the people's right to self-government." *Chula Vista*, 782 F.3d at 531. Requiring that the petitioners' committee consist of voters "ensure[s] that those who exercise this unique legislative power are members of the political community who will be bound by the proposed initiative should it become law . . . ." *Id.* at 531; *see Sugarman v. Dougall*, 413 U.S. 634, 642–43 (1973) ("We recognize a State's interest in establishing its own form of government, and in limiting participation in that government to those who are within 'the basic conception of a political community.' We recognize, too, the State's broad power to define its political community." (citation modified)); *cf. Dunn v. Blumstein*, 405 U.S. 330, 343–44 (1972) (holding that residency requirements for voting "preserve the basic conception of a political community, and therefore could withstand close constitutional scrutiny"). Because strict scrutiny does not apply and the City is likely to prevail under even less rigorous

12

standards, the plaintiffs have failed to demonstrate a substantial likelihood of success on their First Amendment claim.

## B. Declaratory Judgment Claim

The plaintiffs aver that the clerk violated the City's charter in discounting particular signatures and that, absent an injunction, they will face the irreparable harm of being "unable to exercise their right of initiative and lose the opportunity to place their initiative on the ballot at the upcoming election." MPI at 13. Because the plaintiffs fail to establish a substantial likelihood of success on the merits and that they would suffer the same harm even if I granted the motion, they are not entitled to a preliminary injunction arising from the declaratory judgment claim.

The plaintiffs seek an injunction that would require the City's clerk to (1) not discount outright signatures collected before October 7, 2025 and signatures from inactive voters;[2] and (2) accept as valid signatures accompanied by mismatched addresses, minor mistakes in the address, handwriting that the City misread, or that the City staff previously rejected

---

[2] The plaintiffs' motion asks for an injunction that requires "the City to accept as valid" both categories, MPI at 14, but in context with the parties' dispute and the other requirements that the Charter imposes for a signature to be valid (namely that the voter reside in the City of Clearwater), a more precise description of the relief sought is that the plaintiffs seek to have set aside the categorical denial of signatures collected before October 7, 2025, and from inactive voters, *see, e.g.*, Call Aff. ¶ 44 (describing the plaintiffs' pre-lawsuit contention "that the City [is] required to review and *consider* signatures of voters who are 'inactive.'" (emphasis added)); Charter Article VIII (Doc. 18-3) § 8.01 (defining who counts as a qualified voter of the city).

after entering the information incorrectly when comparing to the voter roll. *See* MPI at 14. If, after taking these steps, the number of petitions would be sufficient, the plaintiffs request an injunction ordering the City to take various steps, ultimately culminating in submitting the proposed ordinance to the voters. *See id.* at 14–15.

On the merits, the City presses the better reading of the charter with regard to whether the pre-October 7, 2025 signatures should count. *Compare* MPI at 10, *with* Resp. at 17. Section 6.05 limits the reasons for the clerk to deem a petition insufficient. One permissible basis is whether the petition secured enough valid signatures in support of the initiative. *See* Charter § 6.06(a); § 6.05(a) ("Initiative or referendum petitions must be signed by voters of the city equal in number to at least ten percent of the total number of voters registered to vote in the last regular city election."). The plaintiffs contend that the pre-October 7, 2025 signatures should count because Section 6.05 does not specifically address whether pre-petition signatures suffice. That is an overly myopic reading of one sub-section divorced from the rest of Article VI of the charter, which contains nine subsections sequentially laying out the ballot initiative process. Immediately preceding Section 6.05's requirements for sufficient petitions is Section 6.04's commencement requirements, including the need for five registered voters to comprise the initiative committee and sign an affidavit attesting to that fact. The charter's

14

requirements for initiating a petition dictate that there cannot be valid signatures in support of a petition *before* the petition lawfully exists. The chronological sequencing of the petition process confirms this common-sense reading, and traditional rules of statutory construction likewise require reading the statute as a whole. *See, e.g., St. Mary's Hosp., Inc. v. Phillipe*, 769 So. 2d 961, 967 (Fla. 2000) (per curiam) ("It is a cardinal rule of statutory construction that a statute must be construed in its entirety and as a whole."); *Ham v. Portfolio Recovery Assocs., LLC*, 308 So. 3d 942, 946 (Fla. 2020) ("In interpreting the statute, we follow the 'supremacy-of-text principle'—namely, the principle that '[t]he words of a governing text are of paramount concern, and what they convey, in their context, is what the text means.'" (quoting ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 2, at 56 (2012))). Here, the initiative petition did not officially commence until October 7, 2025, when the fifth and sixth voters submitted affidavits stating they would round out the petitioners' committee. *See* Am. Compl. ¶¶ 22–23. Thus, the City's argument that the 4,306 signatures collected before October 7, 2025, do not count would alone render the petition insufficient and thus relief on the declaratory judgment count impermissible.

The plaintiffs also fail to carry their burden regarding irreparable harm. The City submits an affidavit from the clerk that, even if the otherwise-valid pre-October 7, 2025 signatures and inactive voter signatures (approximately

15

3,134) are counted, the plaintiffs have submitted only 6,345 valid signatures. *See* Resp. at 5; Call Aff. ¶¶ 41, 47. This would fall short of the required 7,067 signatures. Resp. at 5; Call Aff. ¶ 48. The plaintiffs do not contest these figures.

In their papers, the plaintiffs do not allege the number of signatures improperly marked as invalid based on mismatched addresses, minor mistakes in the address, misread handwriting, or because of incorrectly entered information. Using public records requests, the plaintiffs audited "about one-third" of the invalidated signatures. J. Gibbs Decl. (Doc. 8-9) ¶¶ 2–3. In doing so, they purport that they found approximately 110 instances of the aforementioned errors. *See id.* ¶¶ 5, 12. Even if I assume that the plaintiffs are correct about each of the asserted errors and extrapolate the error rate across the unaudited signatures, the plaintiffs would still be short by more than 390 signatures.[3] Issuing the injunction would result in the clerk determining, for a third time, *see* Am. Compl. ¶¶ 32–34, that the plaintiffs failed to obtain enough valid signatures. The petition initiative would thus not be placed on the ballot.[4]

---

[3] 6,345 valid signatures plus 330 signatures incorrectly marked as invalid equals 6,675 signatures.

[4] The plaintiffs also ask that I order the City to allow the plaintiffs to file a second supplementary petition. *See* MPI at 14. The charter does not contemplate more than one supplementary petition, *see* Charter § 6.06(a), and the plaintiffs already filed a supplementary petition on April 17, 2026. Am. Compl. ¶ 33. Because the plaintiffs do not explain how relief that violates the charter would be proper or why they are entitled to it, they fail to carry their burden.

16

Thus, the plaintiffs will suffer the same purported harm regardless of whether I grant their requested injunction, and the motion must be denied. *See PPI, Inc. v. Kempthorne*, No. 4:08CV248-SPM, 2008 WL 2705431, at *6 (N.D. Fla. July 8, 2008) (denying motion for preliminary injunction because the requested relief would not prevent the alleged injury); *Siegel*, 234 F.3d at 1176 ("[T]he absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper.").

## IV.    CONCLUSION

Because the plaintiffs have not carried their burden of persuasion to show a substantial likelihood of success on the First Amendment claim or the charter claim, nor have they carried their burden to show that they will suffer, absent an injunction, an irreparable injury from the violations of the charter, I **DENY** the Motion for Preliminary Injunction (Doc. 8).

**ORDERED** in Tampa, Florida, on June 26, 2026.

Kathryn Kimball Mizelle
United States District Judge

17